**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| Armada Water Assets, Inc., | § | Chapter 11 |
|     Debtor | § | Case No. 16-60056 (DRJ) |
| | § | (**Joint Administration Requested**) |

**DECLARATION OF TOM BREEN IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY RELIEF UNDER 28 U.S.C. §1746**

My name is Tom Breen. I am over the age of twenty-one (21), am competent to make this declaration. I have personal knowledge of the facts as stated herein. I am authorized to execute this Declaration.

I currently serve as the Chief Restructuring Officer (the "CRO") of Armada Water Assets, Inc.; Wes-Tex Vacuum Service, Inc.; Summit Holdings, Inc.; Barstow Production Water Solutions, LLC; Devonian Acquisition Corporation; Western Slope Acquisition Corporation; ORL Equipment LLC; and Harley Dome I, LLC (collectively, "the Debtors").

In my capacity as the CRO, I am familiar with the daily operations and financial conditions of Armada Water Assets, Inc. and its affiliates. I hereby submit this declaration in support of the Debtors' first day motions in the above-captioned chapter 11 cases and to assist the Court and other parties-in-interest in understanding the circumstances leading up to the commencement of these cases. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtors' operations, financial condition, and the industry as a whole. If called to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this Declaration.

1

## BACKGROUND

Armada Water Assets, Inc. ("Armada") is headquartered in Houston and operates a network of multistate comprehensive oilfield services companies providing treatment transportation disposal and delivery of water and similar products for use in the oilfield industry. Armada subsidiaries have fixed operations in Colorado, Utah and Texas.

The subsidiaries resulted from a "roll up" of previously independent businesses in the oilfield services industry serving customers in the Permian, Piceance, and Denver oil basins – oilfields stretching from Utah through Colorado and New Mexico into Texas. The organizational structure is shown on the chart below:



Armada had filed an S-1 to become a public company. However, the oil downturn effectively ended Armada's ability to cash flow positively. Armada withdrew its public filing. The shares are still administered by a transfer agent, Island Capital Management, LLC d/b/a Island Stock Transfer ("Island Stock Transfer"). Currently there are approximately 9 Million shares of common voting stock outstanding. The Debtors' debt and capital structure are

McKool 1183158v4

discussed at greater length below. Generally, no single lender holds the secured or unsecured debt. The Debtors have liabilities of approximately $25 Million, which include $6 Million in trade debt and dozens of smaller promissory notes, many from shareholders. The Debtors were unable to borrow more money, or make payments on existing debt from March of 2016 forward.

To preserve value, Armada laid-off a substantial number of employees and reduced operations to core personnel. Armada is now focusing on preserving long-term value and promising new technology. The purpose of the chapter 11 is to sell nonessential assets, shrink to a core business that can be sustained, recapitalize the company with new money, and emerge with a lower debt burden, exchanging unsecured debt for shares of the reorganized debtor and a pool of cash from the liquidation of unencumbered assets. To facilitate the bankruptcy filing, the DIP Lenders made a small prepetition advance of $161,000 ($57,000 of which was garnished by a creditor), with the bulk of the $1 Million needed for a reorganization to be funded as a secured DIP Loan.

## OPERATIONS/ASSETS OF THE DEBTORS

### Harley Dome

Harley Dome 1, LLC ("Harley Dome") operates a water treatment and oil-skimming, treatment and disposal facility in Utah that can process 15,000 barrels of oilfield wastewater a day. The facility has fixed assets consisting of tanks, processing skimmers, filters, utility shop, truck dock, office, and two fully permitted disposal wells. The facility's aerial view is shown below:



In September 2013, Armada acquired Western Slope Acquisition Corporation ("Western Slope"). At the time Harley Dome was a wholly-owned subsidiary of Western Slope, so Armada acquired Harley Dome in the same transaction whereby it acquired Western Slope.

Harley Dome I's equipment may be subject to liens owed to an electrical contractor and liens in favor of one of the participants in the DIP Lender group for $2,000,000. There is a dispute between Harley Dome and the electrical contractor. This mechanics lien for $800,000 is currently in litigation. Harley Dome suspended employees temporarily but expects to resume operations after the plan is confirmed.

## Barstow

Barstow Production Water Solutions ("Barstow") operates a 176 acre facility in Barstow, Texas (near Odessa) consisting of 150 acres of green belt and 25 acres of factory/plant. The facility produces a heavy "10 Pound Brine Water" product used in the drilling and reworking of

4

oil and gas wells (in conjunction with drilling mud or well service). The facilities include a 10,000 square foot shop, brine facilities, fresh water well, and concomitant office and operational buildings. The facility is not currently operating because there is very little demand for brine, but the facility could resume production easily.

### Summit Trucking

Summit Energy Services, Inc. ("Summit Trucking") (owned by Armada through Summit Holdings, Inc., "Summit Holdings") operates approximately $2 Million worth of heavy trucks and rolling stock near Fort Collins, Colorado for the transportation of non-potable water and water by-products. Armada acquired Summit Holdings in June 2013. As Summit Trucking was a wholly-owned subsidiary of Summit Holdings, Armada acquired Summit Trucking via the same transaction.



As of December 30, 2015, Summit had 14 DOT "18 wheeler" trucks and 14 Trailers, 22 Heavy-duty work trucks, 20 bobtail trailers, and significant miscellaneous trailers and equipment. The Debtor possesses the titles and there is no annotation of a lien on them.

McKool 1183158v4

Accordingly, it is likely the vehicles are not encumbered by perfected liens. Summit Trucking cannot operate profitably in the long-term and thus intends to sell its vehicles at auction and satisfy any perfected liens from the proceeds.

Summit Trucking also has a leased yard where the trucks are maintained. Before the bankruptcy, Summit Trucking had negotiated with its lenders to sell the vehicles at auction. Summit Trucking expects to liquidate the vehicles because the trucks will continue to depreciate while before demand increases to cover the costs.

### Western Slope

As noted above, Armada acquired Western Slope in September 2013. In addition to the shares of Harley Dome, Western Slope owns the right to take water from land in rural Colorado. The water is then sold in the drilling industry. Western Slope has been asked to sell the water rights back to the landowner. Formation Fluid Management asserts a lien on the water rights for approximately $250,000 in Canadian Dollars. The Debtors have not determined whether the lien is perfected and are investigating selling the water rights. Western Slope generates positive cash flow and is operating.

### Wes-Tex

Devonian Acquisition Corporation ("Devonian") and ORL Equipment, LLC ("ORL") own Wes-Tex Vacuum Service, Inc. ("Wes-Tex") and nothing else. Armada acquired Devonian in March 2013, thereby also acquiring ORL and Wes-Tex.

McKool 1183158v4



Wes-Tex operates a five-acre facility near Odessa, Texas with an office building, temporary housing for truckers, a trucking repair shop and yard.  Wes-Tex provides water transportation, treatment and related services in Texas.  It maintained a fleet of about 75 trucks, some of which have been returned to lessors or lenders.  Currently, Wes-Tex has suspended work pending an infusion of new capital.

## Armada Water

In addition to ownership and management of the subsidiaries, Armada has been developing patent pending and trade secret technology for the treatment of water and maintains engineers and equipment for that purpose near Fort Collins, Colorado.

7

## CAPITAL AND DEBT STRUCTURE

The Debtors do not suffer from the traditional "roll up" debt structure because Armada was primarily a stock-based acquisition company.[1]  Armada acquired subsidiaries through a series of preferred stock offerings.  Each preferred Share tranche in Series A-D correlates to an acquisition and has a conversion event (conversion to common stock) at a ratio negotiated during the acquisition.  Series E was created for infusion of $9 Million in new equity and $2 Million in existing debt converted to equity.

### Preferred Shares

| Preferred Series | Use of Shares | Number of Shares | Date of Transaction |
|---|---|---|---|
| A | Barstow Acquisition | 3.75 Million | February 2013 |
| B | Devonian, ORL, Wes-Tex Acquisition | 10.1 Million | March 2013 |
| C | Western Slope, Harley Dome Acquisition | 6.2 Million | September 2013 |
| D | Western Slope, Harley Dome Acquisition | 1.5 Million | September 2013 |
| E | Infusion of equity | 11 Million | |

### Debt

The Debtors have approximately $25 Million in non-contingent liabilities.  While the list below remains subject to objection, recharacterization or disallowance, debt structure based on the end of the March 2016 is approximately:

| | |
|---|---|
| Notes Secured – Armada and/or Subsidiary Assets | $4,583,817 |
| Unsecured Short Term Notes | $5,138,617 |
| Armada Accounts Payable | $1,208,363 |
| Armada Accrued Interest | $1,101,105 |
| Armada Accrued Dividends | $1,425,213 |
| Armada Accrued Expenses (including officer payroll) | $294,187 |
| Other Armada Payables | $926,786 |
| Wes-Tex Secured Notes | $1,232,560 |
| Wes-Tex Accounts Payable | $1,394,085 |

---

[1] Although promissory notes were issued in connection with some of the acquisitions, most of those notes were later converted to stock.

McKool 1183158v4

| Summit Secured Notes (may not be perfected) | $982,551 |
|---|---|
| Harley Dome Unsecured Notes | $2,999,810 |
| Harley Dome Accrued Interest | $303,948 |
| Harley Dome Accounts Payable | $3,350,525 |
| | |
| Total | $24,941,567 |

The Debtors have not yet prepared schedules.  The numbers above are for illustration and can change.  Nothing in these charts is intended to infer that the amounts listed are not subject to dispute or disallowance.  Some subsidiaries hold legacy debt from the previous owner's operation or acquisition debt.  Also, each subsidiary owes significant intercompany debt to the parent.  Total intercompany receivables to Armada from subsidiaries is $16,551,350, plus a $22,041,835 "subsidiary investment" on Armada's books.

## Nontraditional Lender Debt

Armada has been "unbankable" for years.  The Debtors thus borrowed from persons that were not traditional lenders.  Some of these lenders were shareholders who funded money to the Debtors when there was a desperate need of cash.  Thus, some of the shareholder loans appear to have not been documented with an actual promissory note.  Other notes were incurred as "retail" unsecured debt from third parties that were nontraditional lenders.

## EVENTS LEADING TO THE BANKRUPTCY AND DIP LOAN

After borrowing money to make up for negative cash flow, Armada finally ran out of available sources of cash in March of 2016.  The Debtors had exhausted all avenues of raising new money.  Lenders who had unperfected liens still, in many cases, held liens that were effective under applicable non-bankruptcy law.  Armada was locked out by the landlord in April

McKool 1183158v4

2016.  No lender would lend under traditional or even nontraditional bases.  All nonessential employees were let go.  Officers worked without a paycheck.

Yet, Armada has valuable assets and the potential for future grown, including the ability to develop its patent-pending technology.  Simply allowing foreclosure would harm the creditors of Armada.

Armada sought bankruptcy counsel.  Armada found a willing reorganization partner and settled on a proposed reorganization plan that would permit a "shrink to core" strategy involving maintenance of the core business of water treatment.  Unsecured creditors could benefit most from a reorganization.

Unfortunately, the company lacked the funds needed to file a bankruptcy.  Pre-bankruptcy lenders (including Harrington Global) agreed to fund the actions needed to file a bankruptcy, conditioned on the approval of a DIP Loan by the bankruptcy court.  The sole purpose of this loan was to maintain the company to fund a bankruptcy.  The facilitating loan was funded on May 2, 2016.  Only $161,000 was funded pre-bankruptcy, but the DIP Lenders will make a $1 Million facility available to complete the reorganization subject to the terms and conditions of the loan.

While preparing for the bankruptcy, approximately $57,000 was seized by the Texas Comptroller to satisfy outstanding tax debt on or about May 11.  As a result, the CFO and CEO have foregone paychecks and the Debtor has deferred payment of certain obligations that were to have been paid before bankruptcy, including payroll taxes.  The CRO, likewise, worked without compensation for a week.  McKool Smith likewise waived significant fees.

## Facts in Support of the First Day Motions

A.  **Request for Emergency Consideration of Certain "First Day" Motions.**

The Debtors will suffer immediate and irreparable harm if certain First Day Motions are not considered on an emergency basis.  As set forth above, because of the seizure of $57,000 from the operating account by the Texas Comptroller, numerous other creditor demands and increasing impairments to cash flows, a restricting outside of chapter 11 relief is impossible. Accordingly, the Debtors exercised their business judgment in seeking the relief requested in certain motions, as described more fully in the Debtors' Request for Emergency Consideration of Certain "First Day" Matters, on an emergency basis on the first day of their chapter 11 cases in order to protect and preserve their going concern value for the benefit of all stakeholders.

B.  **Emergency Motion for Joint Administration.**

Joint administration of these Chapter 11 cases for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure will reduce the costs of the case. Joint administration is proper due to the ownership structure of the Debtors. The Debtors share common ownership as Armada directly or indirectly owns 100% of each subsidiary. The Debtors have filed consolidated returns as part of a tax consolidation group and there are numerous, significant, intercompany receivables.

The Debtors intend to file with the Court numerous motions and applications, including the various motions and applications which have been filed on the first day of these bankruptcy cases.  Entry of an order directing joint administration of these cases will eliminate unnecessary delay and expense of duplicative motions, applications and notices.  Finally, this Court will be

McKool 1183158v4

relieved of the burden of entering duplicative orders and maintaining duplicative files by jointly administering the bankruptcy cases.

The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration of these cases. The relief sought is purely procedural and will not affect substantive rights.

C. **Emergency Motion for Authority to Implement Certain Notice Procedures Under Bankruptcy Code Sections 105(a) and Bankruptcy Rules 1015(c) and 9007.**

This motion seeks to limit notice sent to creditors and other parties-in-interest in these cases. The mailing of notices of all pleadings and other documents in these cases to each of the creditors and parties-in-interest, and the mailing of notices of all pleadings and other documents to insured depository institutions in contested matters and adversary proceedings via mail, would be both impractical and impose an administrative and economic burden upon the Debtors' estates. Limiting service as called for in the motion to establish notice procedures will make the administration of these cases more efficient and cost-effective. Furthermore, the notice procedures requested in the motion will not directly prejudice the rights of any creditor or other party-in-interest. All creditors and other parties-in-interest retain the ability to request notice of all proceedings in these cases and to be included on the Master Service List at any time. Any party directly affected by the relief requested in a motion will be served.

D. **Motion for Post-Petition DIP Financing.**

Debtors actively attempted to raise financing dollars from various sources over the past months. After approaching numerous parties, The Debtors determined that the most viable option, at this time, is the proposed DIP Lender Group.

Obtaining the DIP financing from another party was challenging due to the fact that the Debtors are no longer operating most of the facilities, various lenders hold liens on classes of tangible and intangible assets, and the small size of the new money needed.

The Debtors sought financing on better terms though discussions with traditional lenders. Lenders of last resort were not available because of timing and other issues, such as the lack of receivables.

Unencumbered credit or alternative financing without superpriority status is not available to the Debtors. We had previously engaged broker dealers and talked to lenders/factors in an effort to obtain financing. We could not, though we attempted in good faith to do so.

The DIP Loan is necessary to preserve assets of the estate because, without it, there is no possibility of an orderly sale of some assets and no possibility of a plan of reorganization. The DIP Lenders will consider, but are not committing to, funding a plan. Without the DIP Loan, only the bare assets are available for creditors in a less orderly liquidation.

The terms of the DIP Loan are fair, reasonable, and adequate under the circumstances. The interest rate is competitive. The liens roll up the facilitation loan lien with a challenge period such that any defects in the existing liens are preserved for the old money (but not new advances). The loan is similar to other loans authorized as DIP Loans.

The proposed financing agreement was negotiated in good faith and, in the opinion of the CRO, is a good exercise of business judgment. The DIP Loan is an exercise of sound and reasonable business judgment and in the best interest of the Debtors' estates and their creditors. We negotiated for significant time on the terms in the DIP order. We were able to increase the size of the new money commitment, among other negotiated terms. We also were able to obtain a low interest rate. All of these were serious, arms-length (by the CRO), and good-faith

negotiations. Moreover, the non-insider shareholders will be actively solicited for their participation in the DIP Loan. To the extent there is a benefit to be obtained from the DIP Loan (*i.e.*, equity in a Reorganized Armada) then all shareholders will have the option to contribute additional funds and obtain a pro-rata benefit. However, at this time there is no guaranteed benefit to any of the DIP Lender group. To be fair, the Debtors propose to send a letter to existing equity holders offering the opportunity to contribute to the DIP Loan, but with the understanding that there is very limited ability to perform due diligence, or otherwise ensure a return.

The proposed financing agreement adequately protects prepetition secured creditors because it offers a challenge period for a committee (representing those with claims that could be impacted) to raise issues with alleged perfection of pre-bankruptcy loans. The DIP Lender believes that the loan will be fully secured by a perfected first lien (with a handful of exceptions), and the UCC searches the Debtors had performed of the states affected by the Debtors seem to confirm this.

The DIP Loan also consents to the use of Cash Collateral, which is a source (albeit a small one) of funds for the bankruptcy process. Without the consensual use of cash collateral, the Debtor may not be able to provide an orderly process to maximize the return to creditors. The consent to use cash collateral is integral to the DIP Loan and the budget that accompanies it.

The Debtor is unable to obtain credit without the DIP Loan. There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted, because any senior lienholders may challenge the priority of the DIP Lien in the challenge period.

E.  **Emergency Motion for Entry of an Order Authorizing Payment of Certain Prepetition Wages, Salaries, and Employee Benefits.**

This motion requests the entry of an order under Bankruptcy Code sections 105(a) and 363(b)(1) authorizing, but not directing, the Debtors to pay, continue, or otherwise honor prepetition obligations (collectively, the "Prepetition Employee Obligations") to or for the benefit of their current employees for compensation and benefits under all plans, programs and policies implemented by the Debtors prior to the Petition Date.

The Debtors have reduced their workforce to a core group of five individual employees, each of whom provides critical functions for the Debtors. As of the Petition Date, all five employees are owed unpaid prepetition wages or salary. The Debtors request authority to pay approximately $53,100 of the total amount of outstanding unpaid wages, and in no event will any individual's prepetition wage claim exceed the $12,475 priority amount established by Bankruptcy Code section 507(a)(4) & (5). The Debtors will also pay prepetition health insurance premiums and accrued prepetition payroll taxes.

F.  **Emergency Application to Employ and Retain Tom Breen as Chief Restructuring Officer.**

Many of the Debtors' prepetition lenders have lost confidence in existing management personnel. The Debtors' relationships with trade vendors are strained. Employment of a CRO is vital to the success of these cases. A new representative of the Debtors specifically focused on restructuring will be able to work with lenders and trade creditors in a much more productive manner than the Debtors' prior management.

The Debtors need to have a CRO to work with the Lenders, trade creditors, professionals, and the Court. The Board of Directors wishes for me to continue on as CRO for all the Debtors through the bankruptcy process. I am experienced in oil and gas bankruptcies and served as a

CRO in several bankruptcy matters. I have been involved with the Debtors before the bankruptcy. The DIP Lenders and the board rely on me. I am critical to the successful execution of this plan to maximize recoveries for the creditors and investors. If the Court does not authorize me to act for the Debtors on an emergency basis, the Debtors will suffer severe and irreparable harm as there will be no bankruptcy expert acting to prepare and sign schedules, negotiate with bankruptcy lenders, or take the other acts needed to preserve estate assets and obtain the best recovery for these estates.

G. **Emergency Motion for Order (I) Authorizing Continued Use of Existing Business Forms and Records; (II) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System; and (III) Waiving the Requirements of 11 U.S.C. § 345(b) ("Bank Account Motion").**

The Debtors maintain the following bank accounts:

| Bank | Entity | Acct # Ending | Signatories |
|---|---|---|---|
| Texas Gulf Bank | Armada | 6358 | Maarten Propper, Sami Ahmad |
| Texas Gulf Bank | Harley Dome | 6366 | Maarten Propper, Sami Ahmad |
| Origins Bank | Armada | 8467* | Maarten Propper, Sami Ahmad |
| Origins Bank | Harley Dome | 9449* | Maarten Propper, Sami Ahmad |
| Community National Bank | Wes-Tex | 2414 | Dusty Yeager, Lee Washington, Arnold Huerta |
| Community National Bank | BPWS | 8625 | Dusty Yeager, Lee Washington, Arnold Huerta |
| Vectra Bank | Summit Energy Services | 5327* | Tom Breen, Zach Donaldson |
| Grand Junction Federal Credit Union | Summit Energy Services | 1835* | Ron Richardson, Jay Harralson, and Karen Vogl (upon information and belief) |
| Vectra Bank | Summit Holdings | 5475* | Tom Breen, Zach Donaldson |

The Debtors' cash management system is designed to permit the efficient collection and application of funds. The Debtors seek permission to continue their existing cash management

16

McKool 1183158v4

system, without opening new debtor-in-possession bank accounts (except to the extent that the Debtors elect to do so in the ordinary course of their businesses).

In many other Chapter 11 cases, debtors found it difficult to open a Chapter 11 DIP account for cases such as the current one. The U.S. Trustee and the Debtors will work together to determine if there is an option, and whether the current institution can be an "approved depository" under the applicable laws.

Permitting the Debtors to maintain their existing bank accounts and existing cash management system (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtors' operations and will not prejudice any party in interest. The Debtors' existing cash management accounts function smoothly and permit the efficient collection of cash for the benefit of the Debtors and all parties in interest. Any requirement that the Debtors open new accounts would hinder the efficient use of the Debtors' resources.

The Debtors also seek a waiver of the requirement in the United States Trustee's "Operating Guidelines and Reporting Requirements for Chapter 11 Cases" (the "Trustee's Guidelines") that they open new sets of books and records as of the Petition Date. Compliance with this requirement would create unnecessary administrative burdens. The Debtors have in place computerized record-keeping systems and will be able to differentiate between prepetition and post-petition transactions.

The relief requested in the Bank Account Motion is necessary to preserve business continuity and to lessen the likelihood of disruption to the Debtors' operations. Requiring the Debtors to implement: (a) new bank accounts; (b) a new cash management system; and (c) the

use of new business forms, books and records would place an undue burden on the Debtors and their estates.

H. **Emergency Motion for Entry of an Order: (I) Establishing Notification Procedures Regarding Transfers of Interests; (II) Approving Restrictions on Transfers of Interests in the Debtors' Estates; and (III) Enjoining Debtors' Transfer Agent From Processing Transfers of, or Issuing, Interests in the Debtors ("NOL Motion").**

The Debtors estimate that, as of the date hereof, they have incurred, for U.S. federal income tax purposes, consolidated Net Operating Losses ("NOLs") of approximately $7 million.[2]

The Debtors' ability to use the NOLs to reduce future tax liability is subject to certain statutory limitations. Sections 382 and 383 of the Tax Code limit a corporation's use of its NOLs, tax credits, and certain other tax attributes to offset future income or tax after the corporation experiences an "ownership change."

Accordingly, consistent with the automatic stay in these cases, the Debtors need the ability to preclude certain transfers of, and monitor and possibly object to other changes in the ownership of, Armada Stock and Armada Options (defined in the motion) to ensure that a 50% change of ownership does not occur prematurely.

The shares of Armada common stock are administered by Island Stock Transfer. In addition to the 9 million shares of common stock, Armada has five series of preferred stock. Each series of preferred stock is convertible to common stock, although the conversion terms vary by series. The preferred stock is also administered by Island Stock Transfer as the transfer agent.

---

[2] The Debtors admit that a certain uncertainty exists as to the exact NOL number because a precise, current, tax analysis has not yet been completed.

Island Stock Transfer has been consulted and agrees in principle to an injunction to prohibit the transfer of shares.

I.  **Emergency Motion for Extension of Time to File Schedules and Statements of Financial Affairs.**

Due to the exigencies described above and the seizure of funds by the Comptroller, the Debtors have not had sufficient time to assemble the requisite financial data and other information required by the Schedules and Statements. To prepare this information accurately, the Debtors must thoroughly examine their books, records, and documents. The collection of this information will require substantial time and effort.

The Debtors have already begun compiling the necessary information to complete the Schedules and Statements. The Debtors and their professionals are currently in the process of reviewing information in connection with the preparation of the Schedules and Statements and will complete this process as soon as possible.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   May _____, 2016

Signed:_____

McKool 1183158v4

Island Stock Transfer has been consulted and agrees in principle to an injunction to prohibit the transfer of shares.

I.  **Emergency Motion for Extension of Time to File Schedules and Statements of Financial Affairs.**

Due to the exigencies described above and the seizure of funds by the Comptroller, the Debtors have not had sufficient time to assemble the requisite financial data and other information required by the Schedules and Statements. To prepare this information accurately, the Debtors must thoroughly examine their books, records, and documents. The collection of this information will require substantial time and effort.

The Debtors have already begun compiling the necessary information to complete the Schedules and Statements. The Debtors and their professionals are currently in the process of reviewing information in connection with the preparation of the Schedules and Statements and will complete this process as soon as possible.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 20, 2016

Signed: _____

McKool 1183158v4