## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | |
| Armada Water Assets, Inc., | § | Chapter 11 |
| Debtor | § | Case No. 16-60056 (DRJ) |
| | § | |
| In re: | § | |
| Wes-Tex Vacuum Service, Inc., | § | Chapter 11 |
| Debtor | § | Case No. 16-60055 (DRJ) |
| | § | |
| In re: | § | |
| Summit Holdings, Inc., | § | Chapter 11 |
| Debtor | § | Case No. 16-60057 (DRJ) |
| | § | |
| In re: | § | |
| Barstow Production Water Solutions, LLC, | § | Chapter 11 |
| Debtor | § | Case No. 16-60058 (DRJ) |
| | § | |
| In re: | § | |
| Devonian Acquisition Corporation, | § | Chapter 11 |
| Debtor | § | Case No. 16-60059 (DRJ) |
| | § | |
| In re: | § | |
| Western Slope Acquisition Corporation, | § | Chapter 11 |
| Debtor | § | Case No. 16-60060 (DRJ) |
| | § | |
| In re: | § | |
| Summit Energy Services, Inc., | § | Chapter 11 |
| Debtor | § | Case No. 16-60061 (DRJ) |
| | § | |
| In re: | § | |
| ORL Equipment LLC, | § | Chapter 11 |
| Debtor | § | Case No. 16-60062 (DRJ) |
| | § | |
| In re: | § | |
| Harley Dome 1, LLC, | § | Chapter 11 |
| Debtor | § | Case No. 16-60063 (DRJ) |
| | § | |
| | § | **(Joint Administration Requested)** |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POST-PETITION FINANCING AND (B) SCHEDULING A FINAL HEARING

## NOTICE UNDER BLR 4001-1(b)

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

THE DEBTORS HAVE REQUESTED THAT THIS MOTION BE CONSIDERED AT THE DEBTORS' FIRST DAY HEARINGS.

**To the Honorable David R. Jones, United State Bankruptcy Judge:**

Armada Water Assets, Inc. ("Armada"), Wes-Tex Vacuum Service, Inc., Summit Holdings, Inc., Barstow Production Water Solutions, LLC, Devonian Acquisition Corporation, Western Slope Acquisition Corporation, Summit Energy Services, Inc., ORL Equipment LLC, Harley Dome 1, LLC, (affiliated debtors of Armada) (collectively, the "Debtors"), in the above-captioned bankruptcy cases (the "Cases") file this emergency motion (the "Motion") to obtain post-petition credit to provide a facility of up to $1 Million[1] to 1) effectuate a sale of assets not being retained for operations by the Debtors, and 2) undertake steps towards a plan of reorganization with the objective of preserving and maximizing value through a strategic

---

[1]   Of which $161,000 was advanced pre-bankruptcy solely to facilitate the bankruptcy filing.

transaction to preserve the existing business status as a public company and its economic and tax benefits.

1.      By this Motion and for the reasons set forth below, pursuant to 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), the Debtors respectfully request entry of an interim order the "Interim Order") and a final order (the "Final Order") thereby, among other things:

a)      authorizing the Debtors, pursuant to sections 105(a) and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014, to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") and to obtain from Harrington Global Opportunities Fund SARL, a Luxembourg company ("Harrington"), as the administrative and collateral agent for a group of postpetition lenders  (collectively, the "DIP Lenders") a senior secured superpriority debtor-in-possession revolving term loan facility (the material terms of which are described below) (the "DIP Facility") with a commitment in an aggregate principal amount of up to $1 Million (the "Commitment"), subject to and in accordance with the approved budget (the "Budget"), attached hereto as **Exhibit A**, subject to Permitted Variances (as defined below) based on written consent by Harrington as the administrative and collateral agent under the DIP Facility under a collateral agreement acting for the DIP Lenders (the "DIP Agent") from the date of the entry of the interim order (the "Interim Order") until the date of the entry of the final order (the "Final Order", and together with the Interim Order, the "DIP Order"), in accordance with the DIP Facility set forth herein;

b)      authorizing the Debtors to enter into the DIP Facility and to perform such other and further acts as may be necessary and appropriate in connection therewith and, on an interim basis, in accordance with the Budget, to use Cash Collateral and to access the DIP Facility, pursuant to the terms and conditions of the DIP Facility;

c)      authorizing the Debtors, pursuant to the DIP Facility, to use the DIP Facility, solely in accordance with the Budget, and not as otherwise prohibited under the DIP Facility, (i) for working capital purposes and payment of administrative fees, costs and expenses incurred in the Cases; and (ii) to pay all principal, interest, fees, expenses and any other amounts payable to the DIP Lenders under the DIP Facility as such amounts

become due and payable, as provided hereunder and in the DIP Documentation (as defined below);

d)        entering orders, first at an interim and then at a final hearing, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, to provide that the obligations of the Debtors to the DIP Lenders under the DIP Facility (the "DIP Obligations") (i) be granted an allowed superpriority administrative expense claim against each Debtor and its respective bankruptcy estate (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of any kind asserted against the Debtors, including, but not limited to, the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726(b), 1113 and 1114 of the Bankruptcy Code, subject only to the Carve-Out; (ii) subject only to the Carve-Out, be secured (A) under section 364(d) of the Bankruptcy Code, by valid, fully perfected, unavoidable, priming first-priority security interests in the Collateral (as defined herein); (B) under section 364(c)(2) of the Bankruptcy Code, by valid, fully perfected, unavoidable, first priority, senior security interests in and liens on all of  the Collateral; and (C) under section 364(c)(3) of the Bankruptcy Code, by valid, fully perfected, unavoidable, junior priority, security interests in and liens on all of the Debtors' currently owned and after acquired encumbered property (collectively, the "Post-Petition Liens");

e)        authorizing (i) the DIP Agent to terminate the funding commitments under the DIP Agreement, and (ii) the DIP Agent to terminate the Debtors' sale, use, or lease of Cash Collateral, each upon the occurrence and continuance of an Event of Default (as defined in the DIP Facility) on the terms specified herein;

h)        subject to the entry of the Final Order, authorizing the waiver of the Debtors' right to assert any claims to surcharge the DIP Collateral under section 506(c) of the Bankruptcy Code;

i)        modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim Order, and, as later applicable, the Final Order;

j)        waiving any applicable stay (including under Rule 6004 of the Bankruptcy Rules) and the provision of immediate effectiveness of this Interim Order, and as later applicable, the Final Order;

k)        scheduling an emergency interim hearing (the "Interim Hearing") on this Motion for the Court to consider entry of the Interim Order; and

l)        scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on this Motion for a date that is before the 45th day after the Petition Date (as defined below) to consider entry of the Final Order authorizing the Debtors to use Cash Collateral (as defined below) and to obtain, on a final basis, the DIP Facility.

In support hereof, the Debtors rely on the declaration of Tom Breen (the "First Day Declaration"), filed concurrently with this Motion on May 23, 2016 (the "Petition Date").   In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

<u>JURISDICTION AND VENUE</u>

2.   This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K) and (M).  The Court can enter final orders consistent with Article III of the United States Constitution.  Venue of these cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507(b), and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-1 and 9013-1.  The lead debtor, Wes-Tex Vacuum operates in the Victoria Division of the Southern District of Texas.

<u>BACKGROUND</u>

Armada Water Assets, Inc. ("Armada") is headquartered in Houston and operates a network of multistate comprehensive oilfield services companies providing treatment, transportation, disposal, and delivery of water and similar products for use in the oilfield industry. Armada subsidiaries have fixed operations in Colorado, Utah and Texas.

The subsidiaries resulted from a "roll up" of previously independent businesses in the oilfield services industry serving customers in the Permian, Piceance, and Denver oil basins – oilfields stretching from Utah through Colorado and New Mexico into Texas.   The organizational structure is shown on the chart below:



Armada had filed an S-1 to become a public company.  However, the oil downturn effectively ended Armada's ability to cash flow positively.  Armada withdrew its public filing. The shares are still administered by a transfer agent, Island Capital Management, LLC d/b/a Island Stock Transfer ("Island Stock Transfer").  Currently there are approximately 9 Million shares of common voting stock outstanding.  The Debtors' debt and capital structure are discussed at greater length below.  Generally, no single lender holds the secured or unsecured debt.  The Debtors have liabilities of approximately $25 Million, which include $6 Million in trade debt and dozens of smaller promissory notes, many from shareholders.  The Debtors were unable to borrow more money, or make payments on existing debt from March of 2016 forward.

To preserve value, Armada laid-off a substantial number of employees and reduced operations to core personnel.  Armada is now focusing on preserving long-term value and promising new technology.  The purpose of the chapter 11 is to sell nonessential assets, shrink to a core business that can be sustained, recapitalize the company with new money, and emerge with a lower debt burden, exchanging unsecured debt for shares of the reorganized debtor and a pool of cash from the liquidation of unencumbered assets.  To facilitate the bankruptcy filing, the

DIP Lenders made a small prepetition advance of $161,000.  The DIP Lenders will fund the remainder of the $1 Million needed for a reorganization subject to the terms and conditions of a secured DIP Loan.

## OPERATIONS/ASSETS OF THE DEBTORS

### Harley Dome

Harley Dome 1, LLC ("Harley Dome") operates a water treatment and oil-skimming, treatment and disposal facility in Utah that can process 15,000 barrels of oilfield wastewater a day.  The facility has fixed assets consisting of tanks, processing skimmers, filters, utility shop, truck dock, office, and two fully permitted disposal wells.  The facility's aerial view is shown below:



In September 2013, Armada acquired Western Slope Acquisition Corporation ("Western Slope"). At the time Harley Dome was a wholly-owned subsidiary of Western Slope, so Armada acquired Harley Dome in the same transaction whereby it acquired Western Slope.

7

Harley Dome I's equipment may be subject to liens owed to an electrical contractor and liens in favor of one of the participants in the DIP Lender group for $2,000,000.  There is a dispute between Harley Dome and the electrical contractor.  This mechanics lien for $800,000 is currently in litigation.  Harley Dome suspended employees temporarily but expects to resume operations after the plan is confirmed.

### Barstow

Barstow Production Water Solutions ("Barstow") operates a 176 acre facility in Barstow, Texas (near Odessa) consisting of 150 acres of green belt and 25 acres of factory/plant.  The facility produces a heavy "10 Pound Brine Water" product used in the drilling and reworking of oil and gas wells (in conjunction with drilling mud or well service).  The facilities include a 10,000 square foot shop, brine facilities, fresh water well, and concomitant office and operational buildings.  The facility is not currently operating because there is very little demand for brine, but the facility could resume production easily.

### Summit Trucking

Summit Energy Services, Inc. ("Summit Trucking") (owned by Armada through Summit Holdings, Inc., "Summit Holdings") operates approximately $2 Million worth of heavy trucks and rolling stock near Fort Collins, Colorado for the transportation of non-potable water and water by-products.  Armada acquired Summit Holdings in June 2013.  As Summit Trucking was a wholly-owned subsidiary of Summit Holdings, Armada acquired Summit Trucking via the same transaction.

McKool 1183183v3

As of December 30, 2015, Summit had 14 DOT "18 wheeler" trucks and 14 Trailers, 22 Heavy-duty work trucks, 20 bobtail trailers, and significant miscellaneous trailers and equipment.   The Debtor possesses the titles and there is no annotation of a lien on them. Accordingly, it is likely the vehicles are not encumbered by perfected liens.   Summit Trucking cannot operate profitably in the long-term and thus intends to sell its vehicles at auction and satisfy any perfected liens from the proceeds.



Summit Trucking also has a leased yard where the trucks are maintained.   Before the bankruptcy, Summit Trucking had negotiated with its lenders to sell the vehicles at auction. Summit Trucking expects to liquidate the vehicles because the trucks will continue to depreciate while before demand increases to cover the costs.

### Western Slope

As noted above, Armada acquired Western Slope in September 2013.   In addition to the shares of Harley Dome, Western Slope owns the right to take water from land in rural Colorado. The water is then sold in the drilling industry.   Western Slope has been asked to sell the water

rights back to the landowner.  Formation Fluid Management asserts a lien on the water rights for approximately $250,000 in Canadian Dollars.  The Debtors have not determined whether the lien is perfected and are investigating selling the water rights.  Western Slope generates positive cash flow and is operating.

## Wes-Tex

Devonian Acquisition Corporation ("Devonian") and ORL Equipment, LLC ("ORL") own Wes-Tex Vacuum Service, Inc. ("Wes-Tex") and nothing else.  Armada acquired Devonian in March 2013, thereby also acquiring ORL and Wes-Tex.



Wes-Tex operates a five-acre facility near Odessa, Texas with an office building, temporary housing for truckers, a trucking repair shop and yard.  Wes-Tex provides water transportation, treatment and related services in Texas.  It maintained a fleet of about 75 trucks, some of which have been returned to lessors or lenders.  Currently, Wes-Tex has suspended work pending an infusion of new capital.

**Armada Water**

In addition to ownership and management of the subsidiaries, Armada has been developing patent pending and trade secret technology for the treatment of water and maintains engineers and equipment for that purpose near Fort Collins, Colorado.

## FACTS RELEVANT TO THIS MOTION

**Capital and Debt Structure**

The Debtors do not suffer from the traditional "roll up" debt structure because Armada was primarily a stock-based acquisition company.[2]   Armada acquired subsidiaries through a series of preferred stock offerings.  Each preferred Share tranche in Series A-D correlates to an acquisition and has a conversion event (conversion to common stock) at a ratio negotiated during the acquisition.  Series E was created for infusion of $9 Million in new equity and $2 Million in existing debt converted to equity.

**Preferred Shares**

| Preferred Series | Use of Shares | Number of Shares | Date of Transaction |
|---|---|---|---|
| A | Barstow Acquisition | 3.75 Million | February 2013 |
| B | Devonian, ORL, Wes-Tex Acquisition | 10.1 Million | March 2013 |
| C | Western Slope, Harley Dome Acquisition | 6.2 Million | September 2013 |
| D | Western Slope, Harley Dome Acquisition | 1.5 Million | September 2013 |
| E | Infusion of equity | 11 Million | 2014-2015 |

---

[2]    Although promissory notes were issued in connection with some of the acquisitions, most of those notes were later converted to stock.

## Debt

The Debtors have approximately $25 Million in non-contingent liabilities.  While the list below remains subject to objection, recharacterization or disallowance, debt structure based on the end of the March 2016 is approximately:

| | |
|---|---|
| Notes Secured – Armada and/or  Subsidiary Assets | $4,583,817 |
| Unsecured Short Term Notes | $5,138,617 |
| Armada Accounts Payable | $1,208,363 |
| Armada Accrued Interest | $1,101,105 |
| Armada Accrued Dividends | $1,425,213 |
| Armada Accrued Expenses (including officer payroll) | $294,187 |
| Other Armada Payables | $926,786 |
| Wes-Tex Secured Notes | $1,232,560 |
| Wes-Tex Accounts Payable | $1,394,085 |
| Summit Secured Notes (may not be perfected) | $982,551 |
| Harley Dome Unsecured Notes | $2,999,810 |
| Harley Dome Accrued Interest | $303,948 |
| Harley Dome Accounts Payable | $3,350,525 |
| | |
| Total | $24,941,567 |

The Debtors have not yet prepared schedules.  The numbers above are for illustration and can change.  Nothing in these charts is intended to infer that the amounts listed are not subject to dispute or disallowance.   Some subsidiaries hold legacy debt from the previous owner's operation or acquisition debt.  Also, each subsidiary owes significant intercompany debt to the parent.  Total intercompany receivables to Armada from subsidiaries is $16,551,350, plus a $22,041,835 "subsidiary investment" on Armada's books.

## Nontraditional Lender Debt

Armada has been "unbankable" for years.  The Debtors thus borrowed from persons that were not traditional lenders.  Some of these lenders were shareholders who funded money to the Debtors when there was a desperate need of cash.  Thus, some of the shareholder loans appear to

have not been documented with an actual promissory note.  Other notes were incurred as "retail" unsecured debt from third parties that were nontraditional lenders.

## **Events Leading to the Bankruptcy and Dip Loan**

After borrowing money to make up for negative cash flow, Armada finally ran out of available sources of cash in March of 2016.  The Debtors had exhausted all avenues of raising new money.  Lenders who had unperfected liens still, in many cases, held liens that were effective under applicable non-bankruptcy law.  Armada was locked out by the landlord in April 2016.  No lender would lend under traditional or even nontraditional bases.  All nonessential employees were let go.  Officers worked without a paycheck.

Yet, Armada has valuable assets and the potential for future growth, including the ability to develop its patent-pending technology.  Simply allowing foreclosure would harm the creditors of Armada.

Armada sought bankruptcy counsel.  Armada found a willing reorganization partner and settled on a proposed reorganization plan that would permit a "shrink to core" strategy involving maintenance of the core business of water treatment.  Unsecured creditors could benefit most from a reorganization.

Unfortunately, the company lacked the funds needed to file a bankruptcy.  Pre-bankruptcy the DIP Lenders (including Harrington) agreed to fund the actions needed to file a bankruptcy, conditioned on the approval of a DIP Loan by the bankruptcy court.  The sole purpose of this prepetition advance was to maintain the company until the time of and to fund the preparation of a bankruptcy filing.  The prepetition advance was funded on May 2, 2016.  Only $161,000 was funded pre-bankruptcy, but the DIP Lenders will make the remainder of the

$1 Million facility necessary to complete the reorganization available to the Company, subject to the terms and conditions of a secured DIP loan.

While preparing for the bankruptcy filing, approximately $57,000 of the $161,000 funded by the DIP Lenders prepetition, was seized by the Texas Comptroller to satisfy outstanding tax debt on or about May 11.  As a result, the CFO and CEO have foregone paychecks and the Debtor has deferred payment of certain obligations that were to have been paid before bankruptcy, including payroll taxes.  The CRO, likewise, worked without compensation for a week.  McKool Smith likewise waived significant fees.

**Concise Statement of the Material Terms of the Proposed Interim Order.**

3.      Pursuant to Bankruptcy Rule 4001(b), the following summarizes the material terms of the Interim Order, which are discussed in more detail below:[3]

| | |
|---|---|
| **BORROWERS:** | Armada Water Assets, Inc., Wes-Tex Vacuum Service, Inc., Summit Holdings, Inc., Barstow Production Water Solutions, LLC, Devonian Acquisition Corporation, Western Slope Acquisition Corporation, Summit Energy Services, Inc., ORL Equipment LLC, Harley Dome 1, LLC, as debtors-in-possession under Chapter 11 of the Bankruptcy Code (collectively, the "Borrowers" or the "Company"). |
| **CONDITIONS TO COMMITMENT:** | The Borrowers shall file voluntary petitions and be debtors in possession under Chapter 11 of the Bankruptcy Code in jointly administered cases (the "Cases") in the Bankruptcy Court. The date on which the Cases are commenced is referred to as the "Petition Date". |
| **DIP AGENT:** | Harrington shall be the administrative and collateral agent (the "DIP Agent") in connection with the DIP Facility under a collateral agreement acting for the DIP Lenders. |
| **DIP LENDERS:** | In addition to acting as the DIP Agent, Harrington, which was the source of the $161,000 prepetition advance, shall also be one of the lenders with respect to the remainder of the DIP Facility (the "DIP |

---

[3]    The summary of the Interim Order is qualified in all respects by reference to the Interim Order.  In the event of any inconsistency between this Motion and the Interim Order, the Interim Order shall govern.

14

| | |
|---|---|
| | Lenders"). |
| **DIP FACILITY:** | A senior secured super-priority term loan facility (the "DIP Facility") in an aggregate principal amount of up to $1 million (the "Commitment"), comprised of an amount up to $1,000,000 of which $161,000 was funded before the Petition Date.  The DIP Facility is a revolving credit facility.

The Commitment will be made (but not funded to the Borrowers) in two draws: (1) in the amount approved by the Bankruptcy Court, occurring on the day of an interim order (the "Interim Order", and together with the Final Order, the "DIP Order") is entered (or on such later date as mutually agreed between the Company and the DIP Agent, which shall not be more than five (5) business days following the Petition Date); and (2) any remaining undrawn DIP Loan, subject to the Funding Request (defined below), occurring on the day the Final Order is entered (or on such later date as mutually agreed between the Company and the DIP Agent).

The first draw of the DIP Loan will be funded upon entry of the Interim Order and thereafter on a weekly basis beginning on the first Monday after entry of the Interim Order or as otherwise agreed by the DIP Agent in writing.

Every Thursday after entry of the Interim Order, the Debtors' CRO shall provide the DIP Lenders with a written request for funding, which shall be consistent with the Budget (the "Funding Request"). The DIP Lender will fund by the following Monday, in accordance with the Budget and the Debtor's request so long as no Event of Default occurred.

Upon being drawn down after entry of the Final Order, proceeds of the DIP Loan will be deposited into one or more bank accounts of the Company reasonably acceptable to the DIP Agent (each, a "DIP Account" and collectively, the "DIP Accounts"); provided that the DIP Agent shall at all times have a perfected first priority lien thereon as well as sole dominion and control, in either case, pursuant to the DIP Order.

Without the consent of the DIP Lenders, amounts in the DIP Account may be used by the Debtors solely for the purposes set forth in this Motion and the budget, attached hereto as **Exhibit A** (the "Budget"), and as authorized by the DIP Order, subject to any variances based on written consent by the DIP Agent (as described herein).

All sale proceeds, cash, hereafter acquired property, proceeds of litigation and insurance policies, account receivable collections, and all other Collateral subject to the DIP Liens shall be applied to reduce the DIP Loan (defined below) on a weekly basis by the |

15

| | |
|---|---|
| | Debtors by the sweeping of the DIP Accounts.

Any amounts remaining in the DIP Accounts at the Maturity (defined below) or earlier termination of the DIP Facility (whether by acceleration or otherwise) shall be applied to reduce the DIP Loan (as defined herein) then outstanding (in such order or priority as determined by the DIP Lenders).

The DIP Facility will be documented pursuant to documentation to be agreed to by the DIP Lenders, including, without limitation, the DIP Order and the pleadings to be filed in the Bankruptcy Court seeking approval of the DIP Order (the "DIP Documentation").

The terms of any Interim Order and Final Order shall contain the Debtors' representations and acknowledgement of the validity and amount of the claims, security interests and liens of the DIP Lenders to $161,000 funded before the Petition Date and shall be binding on the Debtors and any successors of the Debtors, including any chapter 7 or 11 trustee, and that the DIP Loan will continue the obligations of the DIP Lenders.   Further, subject to the Challenge Deadline (described herein), both the Interim Order and Final Order shall contain provisions that the Debtors and their estates, and on their behalf and on behalf of their past, present and future successors, unconditionally, irrevocably and fully forever release, waive and discharge the DIP Agent, DIP Lenders, and any of their respective affiliates, and each of their respective former, current, or future officers, directors, employees, representatives, owners, members, partners, shareholders, agents, financial advisors, and legal advisors from any and all claims, causes of actions, damages, liabilities, actions, and suits related to the claims, security interests, liens and related obligations under the DIP Facility, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, any claims and causes of action arising under the Bankruptcy Code and applicable state law, and any claims and causes of action regarding the validity, priority, perfection or avoidability of the claims, security interests, and liens of the DIP Agent and DIP Lenders for amounts funded before the petition date.

The DIP Lenders shall not be required to marshal assets. |
| **PRIORITY AND SECURITY:** | With the sole exception of actions under 11 U.S.C. §550 and related sections ("Avoidance Actions"), pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Agent and the DIP Lenders shall be granted super-priority administrative expense claims (the "DIP Claims") in respect of the DIP Loan; pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Agent, on behalf of the DIP Lenders, shall be granted a first priority valid and perfected security interests and liens ("DIP Liens") on the |

| | |
|---|---|
| | Collateral (as defined herein) that is not subject to a valid, properly perfected and unavoidable lien or security interest on any such property as of the Petition Date, all known or unknown commercial tort claims and causes of actions and all proceeds thereof, all claims against former employees and all proceeds thereof, all claims for collection against customers and all proceeds thereof, all causes of actions and claims (whether asserted now or after the Petition Date) under the Debtors' existing directors and officers insurance policies and all insurance or other proceeds thereof; and pursuant to Section 364(c)(3) of the Bankruptcy Code, the DIP Agent, on behalf of the DIP Lenders, shall be granted a valid and perfected security interests and liens on any other property of the Company wherever located (now or hereafter acquired and all proceeds, products and offspring thereof) that is subject to a valid, properly perfected and unavoidable lien or security interest on any such property as of the Petition Date that is junior only to such existing security interests and liens.<br><br>The DIP Liens and DIP Claims shall be subject only to the Carve-Out. |
| **CARVE-OUT:** | "Carve-Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717; (ii) to the extent allowed at any time, but subject in all respects to the Budget covenant described herein, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors and any official committee of creditors (the "Committee") and allowed by the Bankruptcy Court at any time in an aggregate amount not to exceed $50,000 before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice.<br><br>For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee of creditors, if any, which notice may be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked. |
| **COLLATERAL:** | As used herein, the term "Collateral" shall mean all of the Company's present or future, tangible or intangible, pre-petition and post-petition real and personal property and other assets of any kind, including, without limitation, all accounts, cash, cash equivalents, deposit accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, licensing |

17

|  | agreements, securities (whether or not marketable), equipment, leases, leasehold interests, real property interests, franchise rights, patents, trademarks, tradenames, copyrights, intellectual property, general intangibles (including, without limitation, all known or unknown claims, causes of action, or choses in action under applicable federal and state law), all known or unknown commercial tort claims and causes of actions and all proceeds thereof, all claims against former employees and all proceeds thereof, all claims for collection against customers and all proceeds thereof, all insurance claims for damaged, stolen, or lost property and all proceeds thereof, all causes of actions and claims (whether asserted now or after the Petition Date) under the Debtors' existing directors and officers insurance policies and all insurance or other proceeds thereof; supporting obligations, letters of credit, letter-of-credit rights, investment property, fixtures and real property, and all cash or non-cash proceeds, products, offspring, substitutions and accessions of any of the foregoing, wherever located, whether now or hereafter existing, whether presently owned and hereafter acquired, of every kind and description, excepting only Avoidance Actions from Collateral. |
|---|---|
| **CASH COLLATERAL:** | As used herein, the term "Cash Collateral" shall mean all "cash collateral" of the DIP Lenders with respect to the Collateral within the meaning of Section 363(a) of the Bankruptcy Code, including, without limitation, the Debtors' cash and cash on deposit in any deposit account or securities account of the Debtors that is subject to a perfected security interest of any the foregoing secured parties.<br><br>Neither Cash Collateral nor the proceeds of the DIP Loan (defined below) may be used by any entity, except by the Debtors' estates and subject to the Budget.  For the avoidance of doubt, any inventory, equipment, or other property purchased using Cash Collateral or the proceeds of the DIP Loan may not be used by, or transferred to, any non-Debtor, except to pay expenses under the Budget. |
| **USE OF PROCEEDS:** | The proceeds of the loan made under the DIP Facility (the "DIP Loan") shall be used by the Debtors (i) for working capital purposes and administrative expenses incurred in the Cases in accordance with the Budget referred to herein (subject to permitted variances), and (ii) to pay the fees and expenses of the DIP Lenders as provided hereunder and in the DIP Documentation. |
| **LIMITATION ON USE OF DIP LOAN AND CASH COLLATERAL:** | Without the DIP Agent's prior written consent, acting at the direction of the DIP Lenders, the proceeds of the DIP Loan and Cash Collateral shall be used by the Company strictly in accordance with the Budget and subject to the Budget covenant (including variances) described herein; provided that in no event shall the DIP Loan, Cash Collateral, Collateral (as defined herein), |

McKool 1183183v3

| | or Carve-Out be used for any of the following purposes: |
| | • object to or contest the validity or enforceability of the DIP Order or any obligations outstanding under the DIP Documentation, the loans any of the DIP Lenders funded pre-bankruptcy; *provided however*, that a creditor, or the official committee of unsecured creditors, if appointed in these Cases, may expend up to $20,000 for the fees and expenses incurred in connection with the investigation of (but not litigation, objection, or any challenge to) any prepetition secured claims and liens under any pre-bankruptcy agreements with a DIP Lender (provided, however, that any such investigation shall not challenge the $161,000 prepetition advance under the DIP Loan, and further provided that the challenge be initiated and completed and any proceeding to object to or challenge any claims, security interests, or liens of the DIP Lenders prepetition loans shall be commenced no later than sixty (60) days after the Petition Date (the "Challenge Deadline"); |
| | • assert or prosecute any claim or cause of action against the DIP Agent or the DIP Lenders other than to enforce the terms of the DIP Facility or the DIP Order; |
| | • seek to modify any of the rights granted under the DIP Order to the DIP Agent or DIP Lenders; |
| | • make any payment in settlement or satisfaction of any prepetition or administrative claim, unless in compliance with the Budget covenant and, with respect to the payment of any prepetition claim or non-ordinary course administrative claim, separately approved by the Bankruptcy Court upon adequate notice to the DIP Agent on behalf of the DIP Lenders; |
| | • object to, contest, delay, prevent or interfere with in any way with the exercise of rights and remedies by the DIP Agent and the DIP Lenders with respect to the Collateral once an Event of Default has occurred (except that Company may contest or dispute whether an Event of Default has occurred and the Company shall be entitled to any notice provisions provided in the DIP Order); or |
| | • except as expressly provided or permitted hereunder or in the Budget, make any payment or distribution to any non-Debtor affiliate, equity holder, or insider of any Debtor outside of the ordinary course of business; provided that in no event shall any management, advisory, consulting or similar fees be paid to or for the benefit of any Debtor affiliate, equity holder, or insider. |
| **INTEREST RATE:** | Interest on the DIP Loan shall be payable or accrued monthly in arrears.  The outstanding principal amount of the DIP Loan shall bear interest at 10.00% per annum simple interest, with interest after an un-cured Event of Default at 14.00% per annum simple |

McKool 1183183v3

| | interest. |
|---|---|
| **FEES:** | **Transaction Fee**: 0.5% on the DIP Loan payable on the earlier of (i) the closing of a sale of all or substantially all of the assets of the Company; and (ii) the effective date of a chapter 11 plan confirmed in the Cases. |
| **MATURITY:** | All loans are to be repaid in full at the earliest of (i) the forty-fifth (45th) day following the Petition Date if, as of such date, the Bankruptcy Court shall not have entered the Final Order, (ii) six (6) months following the Petition Date, (iii) the effective date of a chapter 11 plan (a "Plan") in the Cases which is confirmed by an order of the Bankruptcy Court, (iv) the date of consummation of a sale of all or substantially all of the assets or stock of the Company under section 363 of the Bankruptcy Code (a "363 Sale"), and (v) the termination by the DIP Agent or DIP Lenders upon an Event of Default (any such date, the "Maturity").  Unless otherwise agreed to by the DIP Agent, any confirmation order entered in these Cases must provide for the repayment in full of the DIP Facility on or before the effective date of the Plan and shall not discharge or otherwise affect in any way the joint and several obligations of the Debtors to the DIP Lenders under the DIP Facility. |
| **CONDITIONS PRECEDENT TO FUNDING LOAN PAYMENTS:** | The DIP Documentation shall include customary closing conditions, including, without limitation, entry of the Interim Order, as well as the following orders: Joint administration, application to employ CRO, and Cash Management System.

The DIP Agent, the DIP Lenders and their advisors shall be consulted in good faith before the Debtors file a pleading related to or otherwise referencing the DIP Loan or DIP Lenders.

The Debtors shall provide an updated budget for the period covering the proposal and confirmation of a Plan, reasonably satisfactory in form and substance to the DIP Agent and DIP Lenders.

The Debtors shall cooperate in good faith with the DIP Agent in proposing a Plan of Reorganization in a form reasonably acceptable to the DIP Agent and DIP Lenders. |
| **COVENANTS:** | The DIP Documentation shall include affirmative and negative covenants that are reasonably acceptable to the DIP Agent and the DIP Lenders, which shall reasonably require in the DIP Documentation, including, without limitation, the following, as well as the Budget covenant:

**Affirmative Covenants.**

(a) delivery to the DIP Agent (for distribution to the DIP Lenders) as soon as practicable in advance (at least 48 hours) of filing with |

the Bankruptcy Court the proposed Interim Order, the Final Order and pleadings proposed to be filed in the Bankruptcy Court seeking approval of the DIP Loan (which must be in form and substance reasonably satisfactory to the DIP Agent and the DIP Lenders), all other proposed orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the DIP Agent, the DIP Lenders and their advisors), any plan of reorganization or liquidation, and any disclosure statement related to such plan;

(b) compliance with milestones set forth herein (the "Milestones");

(c) access to all information, documents and communications related to or otherwise referencing the Company's claims or causes of action against any third party, including, without limitation, claims or causes of action against the Debtors' directors and officers, as soon as practicable in advance of the filing and thereafter on a rolling basis;

(d) access to all information, documents and communications related to or otherwise referencing the Company's net operating losses ("NOL") as soon as practicable in advance of the filing and thereafter on a rolling basis; and

(e) access to information (including historical information) and personnel, including, without limitation, bi-weekly (every other week) scheduled meetings, as mutually agreed, with the Company's senior management and the Chief Restructuring Officer, Chief Financial Officer, or such other officer of the Company with similar responsibility, and other company advisors, which meetings shall include reports with respect to any asset sales, account receivables, net operating losses, location of equipment and other matters reasonably requested by the DIP Agent, the DIP Lenders and their advisors.

**Negative Covenants.**

(a) not creating or permitting to exist any liens or encumbrances on any Collateral, other than liens securing the DIP Facility, and any permitted liens (which liens shall include liens in existence on the Petition Date to the extent subordinated pursuant to the DIP Order and other liens described in "Priority/Security" above);

(b) not creating or permitting to exist any other super-priority claim which is *pari passu* with or senior to the claims of the DIP Lenders under the DIP Facility, except for the Carve-Out;

(c) not prepaying any pre-petition indebtedness, except as expressly provided for under the DIP Documentation, in the Budget, or pursuant to "first day" or other orders of the Bankruptcy Court entered upon pleadings in form and substance reasonably

| | |
|---|---|
| | satisfactory to the DIP Agent and DIP Lenders; and |
| | (d) not asserting any right of subrogation or contribution against any other credit party until all borrowings under the DIP Facility are paid in full and the Commitments are terminated. |
| **BUDGET COVENANT:** | Prior to the Petition Date, the Company shall deliver to the DIP Agent a 13-week budget commencing with the week during which the Petition Date occurs, containing line items of sufficient detail to reflect the Company's and any of its subsidiaries' consolidated projected receipts and disbursements for such 13-week period, and such budget shall be in form and substance reasonably satisfactory to the DIP Agent, the DIP Lenders and their advisors (such budget, as supplemented in the manner described below, the "Budget"). |
| | The Company shall deliver to the DIP Agent (for distribution to the DIP Lenders) a report (the "Budget Report"), delivered on Wednesday of each week commencing with the second full week after the Petition Date, showing actual receipts and disbursement through and including the immediately preceding week and explaining variances with respect to disbursements from the Budget that in the aggregate are an amount that is the greater of (i) 10% of any line item and (ii) $10,000 for all disbursements in the Budget, provided, however, that the DIP Agent may approve any Budget variance. |
| | Every two weeks, beginning on the Wednesday that is two weeks following the Petition Date, the Company shall deliver to the DIP Agent (for distribution to the DIP Lenders) supplements to the Budget showing projected receipts and disbursements for the subsequent 13 week period. |
| **506(c) WAIVER:** | Subject to entry of the Final Order, the Collateral shall not be subject to assessment pursuant to section 506(c) of the Bankruptcy Code. |
| **EVENTS OF DEFAULT:** | The DIP Facility shall be subject to the events of default set forth in the DIP Facility and to reflect the commencement of the Cases (without giving effect to any grace periods provided thereunder), in addition to the following additional events of default (each an "Event of Default"): |
| | • Debtors' failure to meet any of the Milestones; |
| | • Debtors' failure to obtain entry of the Interim Order by the 5th business day following the Petition Date; |
| | • Debtors' failure to obtain entry of the Final Order by the 45th day following the Petition Date; |
| | • Debtors' failure to comply with the terms of the Interim Order or |

the Final Order;

• Debtors' failure to comply with the Budget (subject to any permitted variances (as described herein));

• Debtors' failure to perform (or to cause the performance of, as applicable), any term, provision, condition, covenant, or obligation under any DIP Documentation and such failure not being remedied within five (5) business days after receipt of written notice of the failure; provided that the foregoing grace period shall not apply to (a) entry of a Final Order and (b) failure to meet any of the Milestones, neither of which, for the avoidance of doubt, shall be subject to any grace period;

• without the consent of the DIP Agent and the DIP Lenders, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Code approving) adequate protection to any prepetition agent or lender that is inconsistent with this Motion or the DIP Order;

• the filing or commencement of any action or proceeding by the Debtors (or any third party with the Debtors' assistance or support) against the DIP Agent or the DIP Lenders by or on behalf of any of the Borrowers or their agents;

•  the institution or support of any judicial proceeding by the Debtors seeking to challenge the validity of any portion of the DIP Facility, DIP Documentation, the DIP Loan, and the related obligations, or the applicability or enforceability of same, or which seeks to void, limit, subordinate or otherwise adversely affect any security interest or lien created by or in relation to the DIP Facility, DIP Documentation,  or any payment pursuant thereto;

• any lien or security interest purported to be created under the DIP Documentation or DIP Facility shall cease to be, or shall be asserted by the Debtors not to be, a valid and perfected lien on or security interest in any of the Collateral, with the priority set forth in this motion and in the related loan documents;

• entry of one or more orders by the Court granting relief from or modifying the automatic stay to allow any one or more creditors to execute upon or enforce liens on or security interests in any assets of the Debtors (other than with respect to those Debtors for which the DIP Agent and the DIP Lenders provide prior written consent to such relief);

• a breach by the Debtors of any of their respective material post-petition obligations under the DIP Facility and/or DIP Documentation, including, without limitation, any obligations arising under any post-petition letter of credit facility;

|  | • reversal, vacatur, amendment or modification (without the consent of the DIP Agent and the DIP Lenders), for a period in excess of five (5) days, of the Interim Order or Final Order; |
|  | • dismissal of the Debtors' Cases, conversion of any such Case to a chapter 7 case, or the appointment of a chapter 11 trustee or of an examiner or responsible officer (in any such case with expanded powers relating to operation of the business) and the relevant order therefor shall not be reversed or vacated within ten (10) days; |
|  | • unless otherwise approved by the DIP Agent, the entry of an order providing for a change of venue or division with respect to the Cases and such order shall not be reversed or vacated within ten (10) days; |
|  | • any material misrepresentation of fact made in writing by the Debtors to the DIP Agent or any of the DIP Lenders regarding the financial condition of the Debtors, or, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral; or |
|  | • failure of the Company to comply with any covenant herein. |
| **REMEDIES UPON OCCURRENCE OF AN EVENT OF DEFAULT:** | On not less than five (5) business days' prior written notice by the DIP Agent to counsel for the Debtors, the Office of the United States Trustee (and counsel to any appointed official committee of unsecured creditors) of the occurrence and continuance of an Event of Default (following the expiration of any applicable grace period), the DIP Agent may (i) declare the DIP Loan to be immediately due and payable, (ii) terminate the Company's ability to access the DIP Account and the DIP Loan and to use Cash Collateral; and/or (iii) exercise all rights and remedies, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code. |
|  | The Debtors shall not seek to enjoin, hinder, delay or object to the DIP Agent's exercise of rights and remedies in accordance with the DIP Documentation, and at any proceeding with respect to the DIP Agent's exercise of rights and remedies, the Debtors cannot raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default. |
| **INDEMNITY:** | The Debtors shall indemnify, pay and hold harmless the DIP Agent, the DIP Lenders and their affiliates (and their respective directors, officers, employees, agents, professionals, and advisors) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party) |

24

| | |
|---|---|
| | including the expenses incurred by the DIP Agent and the DIP Lenders and in connection with the negotiation, documentation and administration of the DIP Facility (including fees and expenses of counsel and other advisors), and expenses incurred by the DIP Lenders in connection with any default in respect of the DIP Facility and any exercise of remedies in respect thereof. |
| **GOVERNING LAW:** | All DIP Documentation in connection with the DIP Facility shall be governed by the laws of the State of Texas applicable to agreements made and performed in such State (without regard to conflict of law principles) except as governed by the Bankruptcy Code. |
| **ASSIGNMENTS, PARTICIPATIONS, ETC.:** | The DIP Lenders shall be permitted to sell or assign their rights and obligations hereunder, or any part thereof, to any person or entity without the consent of the Company. The DIP Lenders shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without the consent of the Company. |
| **OUT-OF-POCKET EXPENSES:** | All fees, including legal and other professional fees (including any financial advisor to be retained by the DIP Agent or the DIP Lenders), and all reasonable out-of-pocket expenses associated with the transaction are to be paid by the Borrowers upon approval of the Bankruptcy Court. |
| | All borrowings by the Borrowers, all costs, fees and expenses of the DIP Agent or the DIP Lenders (including the fees and expenses of their professionals), and all other obligations owed to the DIP Agent or the DIP Lenders shall be charged to the DIP Account to be established under the DIP Facility, unless such costs, fees, expenses and other obligations have been paid by the Company on a current basis. |
| **MILESTONES:** | **Phase 1** |
| | <div align="center">**DATE**</div> |
| | <div align="center">**ACTION**</div> |
| | Petition Date |
| | • (unless another timeframe is agreed to in writing by the DIP Lenders) Motion filed to authorize auction for liquidation of the Debtors' vehicles, including intellectual property and owned and leased equipment and other property |
| | No later than 14 days following the Petition Date |
| | • Motion filed to engage an auctioneer(s) to market and liquidate the Debtors' assets, including intellectual property and owned and |

leased equipment and other property

No later than 21 days following the Petition Date

• Order approving auction procedures

• Order approving retention of an auctioneer(s)

No later than 60 days following the Petition Date

Auction to be held

No later than 75 days following the Petition Date

Auction results approved by the Bankruptcy Court

**Phase 2 – Plan**: Following the Sale Closing and before entry into the PSA (defined below), the Debtors shall provide an updated budget for the period covering Phase 2 – Plan, satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion.

<div align="center">

**DATE**

**ACTION**

</div>

[_____]

Debtors enter into a plan support agreement ("PSA") with the DIP Agent and DIP Lenders that is satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion

[_____]

• Motion filed to approve a disclosure statement ("DS") and a chapter 11 plan ("Plan") based on, and incorporating all the material terms of, the PSA. Both the Plan and DS shall be satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion

[_____]

Order approving DS and related confirmation and solicitation procedures satisfactory in form and substance to the DIP Agent and DIP Lenders in their sole and absolute discretion

[_____]

Order confirming the Plan

## BASIS FOR RELIEF

**I.    Standards for Approval under Sections 364(c) and 364(d)(1).**

4.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

5.    In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain post-petition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the  estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

6.    In evaluating proposed post-petition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

> a.   unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.   the credit transactions are necessary to preserve assets of the estate;

    c.   the terms of the credit agreement are fair, reasonable, and adequate;

    d.   the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

    e.   the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc*., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group*, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

7.      Section 364 of the Bankruptcy Code also allows for post-petition financing secured by a priming lien.  Section 364(d)(1) provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

    (i)   the trustee is unable to obtain such credit otherwise; and

    (ii)   there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

8.      For the reasons discussed below, the Debtors satisfy the standards required to access post-petition financing on a superiority claim and priming lien basis under Sections 364(c) and 364(d) of the Bankruptcy Code.

    A.    **The Debtors Cannot Obtain Financing on More Favorable Terms.**

9.      In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving

financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

10.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

11.     As set forth above and in the First Day Declaration, the Debtors, with the assistance of their financial and other advisors, after conducting marketing efforts and carefully reviewing the various alternatives, determined that the DIP Facility is the best available option for, among other things, the following reasons: (i) the DIP Facility (after being revised by extensive negotiations and concessions) offered better overall terms when compared to the overall terms of the considered alternatives; (ii) the DIP Facility had the highest certainty of closing given that, among other things, the DIP Lenders already funded $161,000 to facilitate the bankruptcy and thus the Debtors were already indebted to such lenders, which incentivizes DIP Lenders to finish the process they started; (iii) the DIP Agent and the DIP Lenders have a substantial base of knowledge with respect to the Debtors' business, their capital structure and

the Pre-Petition Collateral, which knowledge ultimately saved the estate diligence-related time and expense.

**B.      The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.**

12.      As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets.  *See CFTC . v. Weintraub,* 471 U.S. 343, 352 (1985); *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir 1988).  The DIP Facility, if approved, will provide working capital critical to funding the Debtors' remaining operations.  Without access to the DIP Facility, the Debtors would be forced to cease operating, which would result in immediate and irreparable harm to their businesses and assets by depleting going concern value. Because the Debtors' available and projected liquidity is insufficient to fund a plan, the credit provided under the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

**C.      Terms of the DIP Facility are Fair, Reasonable and Adequate under the Circumstances.**

13.      In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See* Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S D N Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

30

14.     Given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates and their creditors.  The DIP Facility Documents were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.

**D.      Incorporation of the $161,000 Pre-Petition advance on the DIP Facility Should Be Approved.**

15.     As a condition to providing the Debtors with post-petition funding the Debtors desperately need to stay in business and preserve enterprise value for the benefit of all parties in interest, and as an incentive to providing the DIP Facility, the DIP Lenders insisted that the proceeds of $161,000 DIP Facility funded before the petition date will become part of the DIP Loan.  The incorporation is justified because without the $161,000 to file the case and continuity, the Debtors would never have been able to file and the creditors would have been harmed.

16.     Thus, the Debtors, in their business judgment, think it is best to incorporate the facilitation loan of $161,000 into the DIP Facility.  As noted above, no other outside lender was willing to provide prebankruptcy funding that would be more favorable to the Debtors.

17.     Importantly, this accommodation ultimately inures to the benefit of all of the Debtors' stakeholders because it gives the Debtors the liquidity they needed to proceed under chapter 11 with a clear trajectory rather than under a free-fall scenario.  The Debtors will use the DIP Facility to finance their cases and continue expeditiously towards a plan of reorganization. Equally important is the fact that the proposed Interim Order provides that interested parties have an opportunity to investigate and challenge the claims and liens in respect of the DIP Lenders pre-petition claims, within a defined challenge period.

McKool 1183183v3

18.     The DIP Facility that funded $161,000 pre-bankruptcy is a close cousin to the "Roll-Up", except that the amount of debt was kept deliberately small and budgeted only to facilitate the bankruptcy filing.   Roll-Ups are a common feature in debtor-in-possession financings, and courts have approved full roll-ups in a variety of cases, and in certain cases courts have permitted rollups of prepetition debt on the first day of the case.  *See, e.g., In re Laboratory Partners, Inc.*, Case No. 13-12769 (Bankr. D. Del. Oct. 29, 2013) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Southern Air Holdings, Inc.*, Case No. 12-12690 (Bankr. D. Del. Oct. 1, 2012) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Appleseed's Intermediate Holdings LLC*, et al., Case No. 11-0160 (Bankr. D. Del. Jan. 20, 2011) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Hayes Lemmerz Int'l, Inc.*, Case No. 09-11655 (Bankr. D. Del. May 14, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Source Interlink Cos. Inc.*, Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Dayton Superior Corp.*, Case No. 09-10785 (Bankr. D. Del. Apr. 19, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Aleris Int'l*, Inc., Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Pacific Energy Resources, Ltd.*, Case No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (authorizing debtor-in-possession financing that included roll-up under the interim order); *In re Foamex International Inc.*, Case No. 09- 10560 (Bankr. D. Del. Feb. 20, 2009) (authorizing debtor-in-possession financing that included full roll-up under the interim order); *In re Hilex Poly Co. LLC*, Case No. 08-10890 (Bankr. D. Del. May 7, 2008) (authorizing debtor-in-

possession financing that included roll-up under the interim order); *In re Holley Performance Products Inc.*, No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (authorizing debtor-in-possession financing that included roll-up under the interim order). *See also In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012) (authorizing the refinancing of $11,500,000 of existing letter of credit obligations); *In re Velo Holdings, Inc.*, Case No. 12-11384 (Bankr. S.D.N.Y. April 2, 2012) (authorizing a dollar-for-dollar refinancing of prepetition obligations up to $20,000,000); *In re Blockbuster, Inc.*, Case No. 10-14997 (Bankr. S.D.N.Y. Sept. 23, 2010) (authorizing the roll up of secured notes of up to $125 million); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Mar. 18, 2009) (authorizing a $86.5 million refinancing revolving credit facility under a $400 million DIP facility); *In re Lyondell Chemical Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009) (approving a dollar-for-dollar roll up of $3.25 billion of a prepetition secured debt facility); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009) (approving the payment of $79.5 million of prepetition secured indebtedness).

19.     This case is more fair than any "roll up" case because the amount funded was for the purposes of filing the case, and made *on the condition* that the Debtors seek bankruptcy protection and incorporate it into a DIP Loan.  The Debtors have no cash or alternative financing, except for the funds provided by the DIP Lenders.

## E.     Entry into the DIP Facility Documents Reflects the Debtors' Reasonable Business Judgment.

20.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA

and its creditors"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

21.     Bankruptcy courts typically defer to debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974.  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

22.     For the reasons set forth above, the Debtors submit that the entry into the DIP Facility is the exercise of the Debtors' reasonable business judgment.

###     F.     Avoidance Actions are Carved Out from Collateral.

23.     The DIP Lenders exclude all claims and proceeds of actions of the Debtors or their estates under section 550 of the Bankruptcy Code and related sections ("Avoidance Actions").  This is a better result than courts frequently have in most cases and is evidence of good faith negotiations.

G.    **Section 506(c) Waiver Should Be Approved.**

24.    The Court should approve the Debtors' waiver in the Interim Order of any right to surcharge under section 506(c). Such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-In-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)."  *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000), *vacated and remanded on other grounds*, 2001 WL 36381917 (1st Cir. BAP March 11, 2001); *see also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1985) (noting that the debtor had waiver section 506(c) rights in obtaining debtor-in-possession financing).

25.    The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the DIP Facility and the Carve-Out.  In particular, the Debtors have waived the uncertainty of surcharge rights in exchange for immediate and necessary liquidity from the DIP Lenders and the valuable and predictable rights granted to the Debtors' estates' professionals and other interested parties under the Carve-Out.  *See In re Lunan Family Restaurants Ltd., P'Ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure]").  For these reasons, the section 506(c) waiver is appropriate and should be approved under the circumstances.

H.      **Approval of Cash Collateral Use is Reasonable and Necessary.**

26.     Section 363 of the Bankruptcy Code generally governs the use of estate property.

Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the

secured party.   The Debtors have been able to secure an agreement from the Lender on a

consensual Interim Order.   The Interim Order will allow the Debtors to use the Collateral,

including the DIP Collateral, subject to an agreed upon budget.

27.     Section 363(e) provides for adequate protection of interests in property when a

debtor uses cash collateral.  Considered in the context of the Debtors' current and projected cash

position, the proposed Adequate Protection—which the DIP Lender has agreed to—is sufficient

to protect the Lender from any diminution in value to the Collateral.

J.      **Failure to Obtain the Immediate Interim Use of Cash Collateral Would
        Cause Immediate and Irreparable Harm.**

28.     Pursuant to Bankruptcy Rule 4001(b)(2), the Court may conduct an expedited

preliminary hearing on this Motion—sooner than 15 days after this Motion's filing—and

authorize the use of Cash Collateral as "necessary to avoid immediate and irreparable harm to

the estate pending a final hearing."  FED R. BANK. P. 4001(b)(2).

29.     The Debtors have an immediate post-petition need for the use of cash provided by

the DIP Loan and use of Cash Collateral.  Cash is essential for the Debtors to maintain the value

of their estates during the pendency of the Cases.  The Debtors will use cash to, among other

things, procure goods and services from vendors, pay their employee/officer, pay for insurance,

and satisfy other needs during the cases.  Without the ability to use Cash Collateral for such

purposes, the Debtors will not be able to participate in the plan and sale process, and will suffer

immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In

short, the Debtors ability to finance their operations and the availability to the Debtors of

McKool 1183183v3

sufficient liquidity through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.

30.     The Debtors, therefore, seek immediate authority to use the Cash Collateral as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).  Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

**II.      The Automatic Stay Should be Modified on a Limited Basis.**

31.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Lender to file any financing statements, notice of liens, or similar instruments in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the Lender to exercise, upon the occurrence of the Termination Date, certain rights and remedies provided for in the Interim Order.

32.     Stay modifications of this kind are ordinary and standard features of secured parties' consents to use cash collateral and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Cases.  *See, e.g., In re ATP Oil and Gas* (Bankr. S.D. Tex.); *In re CDX Gas* (Bankr. S. D. Tex.).

## <u>REQUEST FOR FINAL HEARING</u>

33.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## <u>SATISFACTION OF BANKRUPTCY RULES 6004(a) AND 6004(h)</u>

34.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## <u>NOTICE</u>

35.     Notice of this Motion will be provided by overnight delivery and/or e-mail or facsimile to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all known or alleged secured creditors; (c) the 30 largest consolidated unsecured creditors of the Debtors; (d) the DIP Lender(s); (e) all known shareholders holding over 5% of a class of equity interests in any of the Debtors; (f) the Securities and Exchange Commission; and (g) the Internal Revenue Service.  The Debtors submit that such notice is sufficient and no other or further notice need be provided.

## <u>CERTIFICATE OF NECESSITY OF<br>REQUEST FOR EMERGENCY HEARING</u>

36.     Without the DIP Facility there is no bankruptcy.

37.     If the Debtors are not permitted to use Cash Collateral, they will be forced to halt their efforts to reorganize, which will result in loss of the value of the business and a reduction in the value of the Debtors' enterprise and estates' assets to the detriment of the Debtors' creditors.

McKool 1183183v3

There would not be a successful chapter 11 proceeding if the current motion is not considered on an expedited basis.

38.     The Debtors estimate that approximately one hour will be necessary for a hearing on this Motion and that approximately two hours may be required for a final hearing.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion on an interim and, after the appropriate notice, a final basis, granting on on a final basis the relief requested; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: May 23, 2016.

MCKOOL SMITH, P.C.

By:    /s/ Hugh M. Ray, III
        Hugh M. Ray, III
        State Bar No. 24004246
        Benjamin W. Hugon
        State Bar No. 24078702
        Veronica F. Manning
        State Bar No. 24098033
        600 Travis, Suite 7000
        Houston, Texas 77002
        Tel: 713-485-7300
        Fax: 713-485-7344

*Proposed Counsel for the Debtors and Debtors-in-Possession*

39